## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| SHARI ACOSTA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-1189 (RC) |
| | : | | |
| v. | : | Re Document No.: | 2 |
| | : | | |
| DISTRICT OF COLUMBIA | : | | |
| GOVERNMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### Denying Plaintiff's Motion for Preliminary Injunction

## I.  INTRODUCTION

Up until her recent termination, Plaintiff, Shari Acosta, had worked with the District of Columbia Government for over eighteen years.  Compl. ¶ 3, ECF No. 1.  On May 7, 2020, alongside her Complaint, she filed a motion for a temporary restraining order to retain her employment during the pendency of this case.  *See* Pl.'s Mot. TRO, ECF No. 2; Pl.'s Mem. Supp. Mot. TRO, ECF No. 2-1.  On May 13, 2020, this Court heard argument from the parties on Plaintiff's motion and denied injunctive relief.  Plaintiff made an oral motion for preliminary injunction during the hearing.  For the reasons stated below, the Court, having considered the parties' briefing, the record, and oral arguments, denies Plaintiff's motion for preliminary injunction.

## II.  FACTUAL BACKGROUND

As alleged in the Complaint, Plaintiff started her employment with the District of Columbia in 2001.  Compl. ¶ 4.  She spent much of her career as a Staff Assistant with the Department of Housing and Community Development ("DHCD") and provided administrative

support to the D.C. Rental Housing Commission ("RHC"), which is an independent, quasi-judicial body with three Commissioners, one of whom is Defendant Michael Spencer.  *Id.*  Plaintiff's lawsuit stems from her acrimonious relationship with Defendant Spencer.

In July 2017, Plaintiff filed an internal complaint with DHCD regarding allegations that Defendant Spencer had treated her in an abusive manner in the presence of Plaintiff's granddaughter.  *Id.* ¶ 6.  The internal complaint later became the subject of a lawsuit brought in D.C. Superior Court in July 2018.  *Id.* ¶ 7.  Around the same time as the filing of the D.C. Superior Court case, Plaintiff was placed on a 120-day detail in a different department of DHCD and removed from her position under Defendant Spencer's supervision.  *Id.* ¶ 8.  After multiple extensions to this detail, on July 19, 2019, Plaintiff was told that she would be returned to her position with RHC under Defendant Spencer.  *Id.* ¶ 10.

Plaintiff returned to work at RHC in September 2019 and within a week was issued a counseling letter by Defendant Spencer that detailed complaints about her performance.  *Id.* ¶¶ 21, 23.  From there, the employment relationship continued to deteriorate.  In November 2019, Defendant Spencer suspended Plaintiff for twenty days.  *Id.* ¶ 24.  At the end of December, Defendant Spencer placed Plaintiff on a Performance Improvement Plan.  *Id.* ¶ 26.  At the end of January 2020, Defendant Spencer ordered Plaintiff to submit to medical and psychiatric fitness for duty examinations.  *Id.* ¶ 27.  On February 21, 2020, Defendant Spencer issued Plaintiff an Advance Notice of a Proposed Termination, *id.* ¶ 28, and on May 2, 2020, he sent her the Final Agency Decision that ended her employment with the D.C. government effective May 7, 2020, *id.* ¶ 30.  One of the stated reasons for her termination in the Final Agency Decision was that Plaintiff "made false sexual harassment claims against Defendant Spencer, and she made false statements to the District of Columbia Office of Risk Management and the Office of Employee

Appeals." *Id.* Plaintiff filed this lawsuit to challenge her termination pursuant to the District of Columbia Human Rights Act, D.C. Code §§ 2-1401 *et seq.* Compl. ¶¶ 32–38.

In support of her motion for preliminary injunction, Plaintiff submitted a declaration detailing the effects her termination will have on her life. *See* Pl.'s Reply at 15–21, ECF No. 13. She states she has "two mortgages, a car payment, credit card payments, utility bills, and other financial obligation . . . with no spouse or other family to assist with bills." *Id.* at 16. She provides financial support to her daughter and granddaughter and states that "[t]he loss of my job and employment income will be devastating to them." *Id.* She claims that her daughter depends on her for health insurance coverage and that she herself requires surgery to remove her gallbladder, which will be impossible to pay for without health insurance. *Id.* at 18–19. She also states that the jobs she has applied for since her termination pay $30,000 to $50,000 less than she was making before and that she would not be able to sustain herself and her family on such a salary. *Id.* at 20. Her declaration also establishes that Plaintiff does have some savings, *id.* at 21 ("draining what little savings that I have"), two retirement accounts, *id.* at 19, and that she had a previous salary of $85,784, *id.* at 17.

### III.  LEGAL STANDARD

Preliminary injunction is an "extraordinary remedy." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The purpose of a preliminary injunction is "to protect [the movant] from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits." *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 954 (D.C. Cir. 2004) (dissenting opinion) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedures § 2947 (2d ed. 1992)).

A plaintiff seeking preliminary injunctive relief "must establish [1] that [s]he is likely to succeed on the merits, [2] that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of the equities tips in h[er] favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). "[T]he plaintiff bears the burden of persuasion on all four preliminary injunction factors in order to secure such an extraordinary remedy." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016) (internal quotations omitted). With respect to irreparable harm, "[m]ere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (quoting *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

## IV.  ANALYSIS

Because the Court finds that Plaintiff has not demonstrated irreparable harm, the Court denies the motion for preliminary injunction without consideration of the other factors relevant to preliminary injunctive relief. *See Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006) (denying injunctive relief on failure to demonstrate irreparable harm without analysis of the other factors).

In government employment cases, irreparable harm is governed by *Sampson*. In that case, the Supreme Court stated that the "District Court, exercising its equitable powers, is bound to give serious weight to the obviously disruptive effect which the grant of temporary relief [is] likely to have on the administrative process . . . the Government has traditionally been granted

the widest latitude in the dispatch of its own internal affairs." *Sampson*, 415 U.S. at 83 (internal

quotations omitted).  Against this backdrop, *Sampson* requires an extraordinary case to justify a

grant of injunctive relief in the government employment context.  *Id.* at 92 n.68.  "[I]nsufficiency

of savings or difficulties in immediately obtaining other employment . . . will not support a

finding of irreparable injury, however severely they may affect a particular individual."  *Id.*  The

*Sampson* Court noted that "[s]uch extraordinary cases are hard to define in advance of their

occurrence," but did not "foreclose[e] relief in the genuinely extraordinary situation."  *Id.*

Courts in this district routinely deny injunctive relief to government employees based on

*Sampson*.  *See, e.g.*, *Washington v. District of Columbia*, 530 F. Supp. 2d 163, 171 (D.D.C.

2008) (finding no irreparable harm where "plaintiffs have alleged only a general financial

hardship"); *Farris*, 453 F. Supp. 2d at 79 ("[G]iven the court's equitable power to remedy for

loss in employment through, for example, back pay and time in service credit, cases are legion

holding that loss of employment does not constitute irreparable injury."); *Int'l Ass'n of*

*Machinists & Aerospace Workers v. Nat'l Mediation Bd.*, 374 F. Supp. 2d 135, 142 (D.D.C.

2005) ("[A] loss of income does not constitute irreparable injury because the financial loss can

be remedied with money damages.").

In *Bonds v. Heyman*, a case invoked by Plaintiff, the court determined that the plaintiff

had shown one of the extraordinary cases referred to in *Sampson*.  950 F. Supp. 1202 (D.D.C.

1997).  There, a 58-year-old African-American woman brought a Title VII claim after her job

was eliminated as part of a reduction-in-force ("RIF") plan.  *Id.* at 1204.  She had worked with

the federal government for nearly forty years and worked her way from a typist position to a

high-level job with substantial responsibility.  *See id.*  After determining that the *Sampson*

standard applies to Title VII cases, the court explained why plaintiff had demonstrated an

extraordinary case:

> After a careful analysis of the facts of this case, the court finds that plaintiff meets the extraordinary *Sampson* standard.  The fact of the matter here is that the Smithsonian will be RIFing a 58 year-old woman who has worked for the Smithsonian for nearly 40 years.  She has no college education, and worked her way up from a typist to a program analyst—attaining a high level position with substantial responsibility.  But should she be terminated, it is unlikely she could ever find work approaching what she now does, if she could find work at all.  It is telling that Bonds has tenaciously fought not only [to] stay employed but to be promoted as well given her age and tenure.  As things now stand, she is entitled to almost 80 percent of her "high three" average salaries should she retire now.  She would also retain her health and life benefits.  The government argues this cuts against a finding of irreparable injury.  To the contrary: rather than leave her job, Bonds has chosen to work, where she maintains a high level of job performance, according to her performance ratings.  The fact that she could retire and be nearly as well off financially without having to lift a finger, shows just how much of her life is tied into her career.  Rather than merely proffering or alleging injury to her livelihood, Bonds has demonstrated it by her very actions.

*Id.* at 1215 (internal citations omitted).  The court also noted that because of the cap on

compensatory damages, the plaintiff would never be able to fully recover for her injuries.  *Id.* at

1215 n.15.  Adding additional color to its analysis, the court stated "[w]e are here presented with

a truly extraordinary situation, fraught with remarkable, if not questionable, organizational and

managerial decisions."  *Id.* at 1216–17.

Another case discussed by the parties, *Lee v. Christian Coalition of America, Inc.*, while

not invoking *Sampson*, offers insight into what type of economic harm might rise to the level of

irreparable harm.  160 F. Supp. 2d 14 (D.D.C. 2001).  There, a group of data-entry employees

brought a lawsuit "concerning Jim Crow-style discrimination" after their employer dramatically

reduced their work hours.  *Id.* at 17.  After noting that normally economic harm cannot constitute

irreparable harm, the court found that the plaintiffs "demonstrated that because they are so poor,

the loss of their jobs would rise to the level of irreparable harm."  *Id.* at 31.  The plaintiffs

submitted declarations explaining their difficulty paying bills, difficulty paying rent, and the

substantial risk of losing housing and being unable to feed their children. *Id.* at 32. The court

explained that the "inability to pay utility bills or to feed one's children or the risk of being

evicted from one's home, amounts to irreparable injury that money damages cannot remedy."

*Id.* But the court cautioned that its holding "should be narrowly construed" and that a "middle-

class person facing employment discharge who would be unable to pay off the entire balance of

his credit card bill each month would not have made a showing of irreparable harm." *Id.*

   Plaintiff primarily relies on *Bonds* and argues that her termination "will be far more

devastating than the Plaintiff in *Bonds*." Pl.'s Reply at 22. Plaintiff notes the factual similarities

between her case and *Bonds*—that she "only has a high school diploma, has worked really hard

and earns a salary of over $85,000." *Id.* At oral argument, Plaintiff also cited *Lee* to explain

that, like the plaintiffs in that case, she would face extreme economic hardship without injunctive

relief, including potential homelessness. Her declaration attached to her Reply explains her

financial obligations, medical situation,[1] and likely hardships she will face during the job search

amidst a pandemic. *See* Pl.'s Reply at 16–21.

   Defendants argue that the only controlling precedent is *Sampson* and that *Bonds* and *Lee*

are both distinguishable on the facts. Defendants state that "*Sampson* categorically forecloses any

finding that Plaintiff's alleged insolvency and unemployability—the apparent bases of her alleged

---

[1] The Court acknowledges Plaintiff's statement that she requires gallbladder surgery. Pl.'s Reply at 18. However, given that she did not raise this issue until her Reply, this does not appear to be the focus of her request for preliminary injunctive relief nor the type of critical care that courts have acknowledged may be the basis for a finding of irreparable harm. *See Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 3 (D.D.C. 2002) (noting the plaintiff's diagnosis of congestive heart failure, possible pulmonary embolism, and necessary prostate surgery). Moreover, programs like Medicaid are designed to provide the indigent or impoverished a means by which to obtain necessary medical treatments. *See Stewart v. Azar*, 366 F. Supp. 3d 125, 131 (D.D.C. 2019) (describing purpose of Medicaid).

injury . . . are in fact *irreparable*." Defs.' Surreply at 4 (emphasis in original), ECF No. 16.
Defendants claim that the plaintiff in *Bonds* had an "extraordinary case" not because of the
demographic traits she shares with Plaintiff, but rather because "Bond's exceptional progression
from entry level employee to Deputy Director, and her demonstrable, non-economically motivated
connection to her work." *Id.* at 5–6. Defendants distinguish *Lee* by noting that the case does not
apply *Sampson* because it dealt with a private employment relationship and that Plaintiff here has
not demonstrated the same dire financial situation shown by the plaintiffs in *Lee*. *Id.* at 6–7.

The Court finds that Plaintiff has not demonstrated that her case meets the *Sampson*
standard for irreparable harm. While she has attested to the hardships she will face, these do not
go beyond the "insufficiency of savings or difficulties in immediately obtaining employment"
present in all employment termination cases. *Sampson*, 415 U.S. at 92 n.68. Furthermore, the
evidence presented here does not demonstrate the type of severe poverty the court analyzed in
*Lee*.[2] In fact, Plaintiff's former yearly income, coupled with her retirement accounts, suggest
that, while expenses may be tight, she is not in imminent danger of failing to feed her family or
being forced onto the streets. She also has not claimed that she has needed to, or will imminently
need to, apply for public benefits as the plaintiffs did in *Lee*. *See* 160 F. Supp. 2d at 32–33. And
while Plaintiff relies heavily on *Bonds*, that case dealt with a unique combination of factors that
included an employee who worked through the ranks to a position of great responsibility and a
strong case of racial discrimination; courts have since distinguished *Bonds* on the facts. *See*
*Farris*, 453 F. Supp. 2d at 80–81 ("The court's holding in *Bonds*, however, marks an exception,
not a rule."); *Zirkle v. District of Columbia*, 830 A.2d 1250, 1257 (D.C. 2003) ("*Bonds* presented

---

[2] The Court recognizes, as Defendants note in their briefing, that *Lee* does not apply the
heightened standard from *Sampson*.

a truly extraordinary situation . . . not present here.") (internal quotations omitted).  The normal difficulties faced by loss of employment simply do not constitute irreparable harm, however substantial they may be.[3]  *Farris*, 453 F. Supp. 2d at 79–80 ("[C]ases are legion holding that loss of employment does not constitute irreparable injury.") (citing *Sampson*, 415 U.S. at 88–92).  While Plaintiff presents an extremely sympathetic case (one that is likely to resonate with a jury), the high bar set by *Sampson* is not cleared based on the evidence presented.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 3, 2020                                          RUDOLPH CONTRERAS
                                                              United States District Judge

---

[3] Plaintiff notes that the difficulties in obtaining a new job are exacerbated by the current public health emergency related to COVID-19.  Pl.'s Reply at 22.  While the current state of affairs in D.C. and Plaintiff's age will likely make it more difficult to immediately find a job, Plaintiff has just begun her job search and, thus, her claim of being unemployable does not rise beyond a speculative level.  *See Trudeau v. Federal Trade Comm'n*, 384 F. Supp. 2d 281, 297 (D.D.C. 2005) ("[P]laintiff must show that the harm [s]he faces is imminent and certain, rather than remote and speculative.").