## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **SHARI ACOSTA** ) | |
| **2860 South Meade Street** ) | |
| **Arlington, VA 22206** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:20-cv-1189** |
| ) | |
| **DISTRICT OF COLUMBIA GOVERNMENT** ) | **Jury Trial Demand** |
| **1350 Pennsylvania Avenue, N.W.** ) | |
| **Washington, D.C. 20004** ) | |
| ) | |
| *Serving:* ) | |
| ) | |
| **Honorable Muriel Bower** ) | |
| **Mayor of the District of Columbia** ) | |
| **1350 Pennsylvania Avenue, N.W.** ) | |
| **Washington, D.C. 20004** ) | |
| ) | |
| **Attorney General for the District of Columbia** ) | |
| **441 Fourth Street, N.W., Suite 630S** ) | |
| **Washington, D.C. 20001** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## AMENDED COMPLAINT FOR DAMAGES

Comes now Plaintiff Shari Acosta, by and through her attorneys, and hereby files this Amended Complaint pursuant to 42 U.S.C. § 1983 for violations of her civil rights under the First Amendment to the United States Constitution and violations of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401 *et seq.*, against Defendant District of Columbia Government.

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the First Amendment to the United States Constitution and

are asserted here pursuant to 42 U.S.C. § 1983. Plaintiff's claims under the statutory law of the District of Columbia arise from the same events as the constitutional claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the events giving rise to all claims occurred in the District of Columbia.

## PARTIES

3.      Plaintiff Acosta is a Caucasian, sixty-two (62) year old woman, a single mother and grandmother, a citizen of the United States, and a resident of the Commonwealth of Virginia. Prior to her unlawful termination, she was a dedicated employee and public servant with Defendant District of Columbia Government for over eighteen (18) years. She has received awards and commendations during her tenure as a Staff Assistant, including an Outstanding Customer Service Award from former Mayor Anthony Williams, DHCD Employee of the Month, and numerous outstanding performance appraisals during her successful career with the D.C. Government, including a 2009 commendation from then-Deputy Director Mulderig when he described her as "without question, the most capable staff assistant I have ever had in my nearly 30 year career as a professional manager."

4.      In 2001, Plaintiff Acosta started working for the Defendant District of Columbia Government at the Office of Human Rights as an Intake Officer. In 2002, she began working as a Staff Assistant with Defendant's Department of Housing and Community Development ("DHCD"). Although Plaintiff Acosta worked for the DHCD, beginning in September 2011 she was assigned to the D.C. Rental Housing Commission ("RHC"), which, at the time, was a component of the DHCD.

5.      Defendant District of Columbia Government is a municipal corporation, the local government of Washington, D.C. It operates and governs the RHC pursuant to the laws of the District of Columbia. In this case, the District of Columbia acted through its agents, employees, and servants and is Plaintiff's employer within the meaning of the District of Columbia Human Rights Act.

6.      When Plaintiff Acosta joined the RHC, the DHCD provided the RHC with administrative, budgetary, and programmatic support. The DHCD's administrative support including providing support staff, such as Plaintiff Acosta, to the RHC. At the time, the RHC staff included the Chairman and the two other Commissioners, two Attorney Advisors, one Rental Housing Program Specialist, one Clerk of the Court, and one Contractor-Receptionist. But, effective October 1, 2019, the Council of the District of Columbia approved legislation that established the RHC as an independent agency. Now, the RHC is an independent, quasi-judicial body with three Commissioners (one of whom is the Chair). All three Commissioners are appointed by the Mayor of the District of Columbia. At all times relevant, Michael T. Spencer was the Chair of the RHC.

## FACTUAL ALLEGATIONS

7.      Plaintiff Acosta suffers from a number of serious medical conditions (including spinal stenosis and chronic gallbladder problems) and is a caregiver for her young granddaughter (who suffers from developmental and behavioral issues). Plaintiff Acosta also provides substantial support to her daughter, who suffers from medical problems. In July 2017, Plaintiff Acosta filed an internal complaint with her then-Agency ("DHCD") because: (a) on June 30, 2017, Spencer was verbally abusive to her in the presence of her granddaughter (Plaintiff Acosta had come into the RHC office briefly to drop off a pediatrician's note to support her leave request to care for her sick granddaughter); (b) he changed her work hours; (c) placed on her on multiple performance

improvement plans; and (d) took a series of calculated adverse personnel actions, including a five-day suspension. Plaintiff Acosta filed Charges of Discrimination with the D.C. Office of Human Rights ("OHR") against Defendant Spencer in December 2017 and January 2018.

8.      On December 28, 2017, Mr. Spencer sent Plaintiff Acosta approximately eighteen emails (in two separate and lengthy email chains) while he was on vacation, demanding to know when, with whom, and why she had a meeting with the OHR. Mr. Spencer's emails demanded that she respond to his email immediately. Mr. Spencer later told Plaintiff Acosta that he had been at a beach and was upset to learn of her discussions with the OHR, which, in his mind, required him to interrupt his vacation to email her.

9.      In fact, on December 28, 2017, Plaintiff Acosta did file an EEO complaint against Mr. Spencer with the OHR. In a brazenly retaliatory act, on January 2, 2018, Mr. Spencer issued an admonishment letter to Plaintiff Acosta.

10.      On December 28, 2017, Ms. Acosta submitted three Family and Medical Leave Act ("FMLA") requests with medical certifications for: (1) her medical conditions (spinal stenosis and gallbladder disease); (2) her daughter's mental health illness (care for a family member); and (3) her granddaughter's behavioral therapy, including transporting her to daycare/school (care for a family member). As Plaintiff Acosta's requests were being processed, Mr. Spencer threatened to charge Plaintiff Acosta as AWOL, docked her pay for two hours (she had documented that she was ill at her doctor's office), and imposed a ninety (90) day leave restriction on her as of January 10, 2018.

11.      In December 2017 and January 2018, Plaintiff Acosta left voicemail messages for, sent numerous emails to, and had several phone conversations with DHCD Chief Administrative Officer Drew Hubbard (he supervises Human Resources ("HR")), concerning harassment,

retaliation, and the hostile work environment created by Mr. Spencer. Plaintiff Acosta literally begged Mr. Hubbard to transfer her away from Mr. Spencer's harassment and the hostile work environment. Also, in December 2017 and January 2018, Plaintiff Acosta complained about Mr. Spencer's harassment, retaliation, and the hostile work environment to DHCD HR official Marvin McCoy, RHC Attorney D. Greer, District of Columbia Human Resources ("DCHR") Representative Lizette Ortiz, and EEO Counselor Jody Harrington (an Attorney with the D.C. Office of Contracts and Procurements). No action was taken by the DHCD or any other HR official as a result of Ms. Acosta's numerous complaints.

12.     On January 9, 2018, Mr. Spencer continued retaliating against Plaintiff Acosta with a second retaliatory admonishment letter (Admonishment Letter 2), which he retracted and later incorporated into an advance notice of proposed eight-day suspension. During the January 9, 2018, meeting when Mr. Spencer attempted to give her Admonishment Letter 2, Plaintiff Acosta became very ill. A coworker called 911 and the attending EMTs provided medical care and then transported her in an ambulance to the hospital.

13.     On January 19, 2018, Mr. Spencer issued Plaintiff Acosta an Advance Notice of Proposed Suspension for Nine Days (Advance Notice 1) for purported acts of unprofessional conduct, making material misrepresentations, and neglect of duty. Mr. Spencer was motivated by his anger at Plaintiff Acosta's responses to his interference with her taking leave necessary to care for herself and her family. When Mr. Spencer gave Plaintiff Acosta the paperwork for Advance Notice 1, he also handed her a flash drive that contained a video recording that he had secretly made of the meeting on January 9 (Admonishment Letter 2 meeting) documenting her illness and the treatment provided by the paramedics.

14.     Mr. Spencer continued obsessing over and harassing Plaintiff Acosta. On January 19, 2018 (and again on January 24, 2018), he sent her two email addendums to Advance Notice 1, which listed additional charges against her. Advance Notice 1 and its two addendums were later replaced on February 8, 2018, with an Advanced Notice of Proposed Suspension for eight days ("Advance Notice 2"), citing similar alleged charges. Additionally, Mr. Spencer made ongoing threats to Ms. Acosta about denying or potentially denying her leave requests during this same time period.

15.     On February 12, 2018, Mr. Spencer placed Ms. Acosta on a complex Performance Improvement Plan (PIP 1). The PIP was twelve pages long, with five columns on each page, typed in a small, hard to read font. While PIP 1 was in place, Mr. Spencer obsessively micromanaged Plaintiff Acosta and gave her manufactured, negative reviews regarding her performance under PIP 1 (he complained about virtually every single assignment she had). The PIP obviously was a building block in Mr. Spencer's effort to create a pretext for firing Plaintiff Acosta, despite having faithfully served the residents of the District of Columbia for sixteen years. Mr. Spencer's actions were blatantly illegal retaliation in response to Plaintiff Acosta's December 2017 and January 2018 EEO complaints with the OHR.

16.     Overwrought about his importance, in February 2018, Mr. Spencer told Plaintiff Acosta that as a Commission member he enjoyed "the privilege of being a judicial member[] of the D.C. Bar, and that judicial membership is the most revered membership available to attorneys."

17.     On March 16, 2018, Mr. Spencer placed Ms. Acosta on an unpaid, five-day suspension.

18.     As Mr. Spencer's weirdly obsessive harassment continued, on July 13, 2018, she withdrew her OHR complaints, and filed a three count Complaint in the Superior Court of the District of Columbia against Defendants the District of Columbia Government and Michael Spencer, alleging family responsibility and disability discrimination and a hostile work environment (Count I);

retaliation in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401, *et seq*. (Count II); and illegal interference with, and retaliation for exercising, her right to take medical leave in violation of the District of Columbia Family Medical Leave Act ("DCFMLA") D.C. Code § 32-501, *et seq*. (Count III).

19.     During a proceeding in that case, Ms. Acosta spoke truthfully about her experiences working with Michael Spencer.

20.     In response to Plaintiff Acosta's complaints, DHCD management convened an April 2018 meeting with the Union (AFGE Local Union 2725), Plaintiff Acosta, Spencer and DHCD management (Drew Hubbard and Allison Ladd), to discuss Mr. Spencer's decision to impose PIP 1 and his overall (mis)treatment of Plaintiff Acosta. As a result of the meeting and Mr. Spencer's inability to control his emotions, DHCD Deputy Director Ladd placed Plaintiff Acosta on administrative leave, as she investigated the situation. On July 13, 2018, Deputy Director Ladd placed Plaintiff Acosta on a 120-day detail to a staff assistant position in the protected work environment at DHCD Development Finance Division ("DFD"). Deputy Director Ladd renewed the detail for another 120 days in November 2018, with a March 26, 2019, expiration date. In March 2019, approximately one week before the detail was due to expire, Plaintiff Acosta contacted Deputy Director Ladd for the second time, trying to get confirmation that her detail had been renewed.  Deputy Director Ladd indicated that she would get back to Plaintiff Acosta with more information. From March 2019 until July 19, 2019, Plaintiff Acosta was given no further information about her detail.

21.     While Plaintiff Acosta was on detail at DFD, she performed vital Staff Assistant work for Managers Erin Wilson and Reshma Holla, who were both extremely pleased with her work. Plaintiff Acosta helped with DFD's extremely heavy workload and received an excellent mid-year

evaluation from Ms. Wilson. Two staff assistants in DHCD-DFD were out on extended leave (maternity and sick leave), so the managers were delighted to have her assistance.

22.     On July 19, 2019, Plaintiff Acosta was instructed to meet in person with Deputy Director Ladd. During that meeting (which was Deputy Director Ladd's last day of employment with the District Government), Deputy Director Ladd gave Plaintiff Acosta a memorandum ending her detail and returning her to the RHC, once again under the supervision of Mr. Spencer - the manager who had harassed her and retaliated against her after she filed her employment discrimination complaints against him. Deputy Director Ladd's memo indicated that she was giving Plaintiff Acosta one week to make arrangements prior to returning to the RHC. During that same meeting, Deputy Director Ladd gave Plaintiff Acosta a second memorandum, validating and confirming Plaintiff Acosta's complaint that Mr. Spencer had altered and falsified an official District Government record (Plaintiff Acosta's 2016/2017 performance evaluation). For over a year Plaintiff Acosta had been talking to Deputy Director Ladd about the fact that Mr. Spencer had altered and falsified her performance appraisal for the 2016/2017 rating period, which had been completed by Plaintiff Acosta's supervisor of record for that review period, Peter Szegedy-Maszak. In January 2018, Plaintiff Acosta discovered that Mr. Spencer had been granted access to the PeopleSoft system, the electronic payroll system for the District Government that also stores employee performance appraisals. Former Chairman Maszak's comments were constructive and positive. Unbeknownst to Chairman Maszak or Plaintiff Acosta, Mr. Spencer altered Chairman Maszak's positive comments, so that anyone who viewed the performance review for that period reasonably believed that his unauthorized, false comments were, in fact, her performance appraisal. DHCR officials and Deputy Director Ladd acknowledged in writing that Mr. Spencer was not authorized to alter (and falsify) the 2016/2017 performance appraisal.

23.     Plaintiff Acosta's supervisors at DHCD-DFD (Ms. Wilson and Ms. Holla) were not consulted when it was decided to return Plaintiff Acosta to RHC; they were shocked and displeased to learn that Plaintiff Acosta would be leaving the division when they were so short staffed. Plaintiff Acosta pleaded with Deputy Director Ladd; asking why, on her last day on the job, she would force Plaintiff Acosta back to the hostile work environment at the RHC, where it was known by District Government managers, she was subjected to harassment and retaliation.   Plaintiff Acosta's concerns that she was being targeted were heightened, as her lawsuit involving Spencer was being actively litigated.

24.     Plaintiff Acosta contacted DHCD Director Polly Donaldson and asked to meet with her to discuss this adverse decision. DHCD Director Donaldson and Interim Deputy Director Bekele refused to meet with Plaintiff Acosta to discuss her pressing personnel problem and the likelihood that Spencer would continue his abusive behavior. Plaintiff Acosta was instructed in Deputy Director Ladd's memorandum to direct all of her questions to Jacinda Miller, HR representative at DCHR. Ms. Miller provided some assistance initially. However, a few days after receiving Deputy Director Ladd's July 19, 2019 memorandum, Plaintiff Acosta was told that Ms. Miller was out of the office until August 1, 2019. So, Plaintiff Acosta sought additional help from Interim Deputy Director Bekele but he was unwilling to intervene or otherwise protect a long-term employee who was being targeted with ongoing illegal harassment and retaliation.

25.     Before leaving the office in July 2019, Ms. Miller did request DHCD management to modify Plaintiff Acosta's administrative leave from one week to two weeks of paid leave - July 22 through August 2, 2019. Ms. Miller was also able to confirm that the RHC would honor Plaintiff Acosta's pre-approved vacation - August 5 through August 9, 2019. During that time, Plaintiff Acosta continued asking senior District Government officials to prevent her transfer to the RHC

and Mr. Spencer's harassment and retaliation. Plaintiff Acosta contacted the Deputy Mayor's Office for Planning and Economic Development and Council Member Anita Bonds's office - asking both to intervene and protect her from the hostile work environment Mr. Spencer had created at the RHC. But neither office was able to provide her with any assistance.

26.     Following Plaintiff Acosta's receipt of the July 19, 2019, email from Deputy Director Ladd, she became extremely ill from the stress and anxiety associated with receiving the brunt of Mr. Spencer's harassment and retaliation. Plaintiff Acosta received medical advice and treatment from her health care provider, Kaiser Permanente, on multiple occasions after July 19, 2019, for two very painful gallbladder attacks, high blood pressure, stress, and anxiety. Plaintiff Acosta's mental health doctor, Dr. Moghal prescribed a Kaiser Intensive Outpatient Program at Kaiser Behavioral Health for two weeks - August 5 through August 16, 2019.

27.     On August 5, 2019, Plaintiff Acosta emailed her doctor's orders to Mr. Spencer and Jacinda Miller, establishing that her doctor ordered her not to work the week of August 5, 2019 (which was already approved vacation leave), or the week of August 12, 2019, which should have been covered by FMLA. Plaintiff Acosta also submitted a leave request in the PeopleSoft system requesting an additional week of sick leave for August 12 through August 19, 2019, per her doctor's orders.

28.     Mr. Spencer initially denied Plaintiff Acosta's leave request, thereby ignoring her doctor's prescription for intensive behavioral health programming. On August 6, 2019, Mr. Spencer also emailed Plaintiff Acosta stating inaccurately that she did not have leave for this period, so he was left with no choice but to deny her doctor-ordered sick leave. Mr. Spencer denied her leave request, despite having earlier promised Plaintiff Acosta's union representatives that he would honor her prior FMLA authorization.

29.     Given Mr. Spencer's refusal to honor his promise to respect Plaintiff Acosta's FMLA (and, therefore, her doctor-ordered leave request), she renewed her FMLA application through DCHR Representative Jacinda Miller, who was DCHR's FMLA coordinator. Ms. Miller approved Plaintiff Acosta's FMLA application, which Dr. Moghal verified was medically necessary. Ms. Miller notified Mr. Spencer of Plaintiff Acosta's approved FMLA. Mr. Spencer then reluctantly approved Plaintiff Acosta's leave request for the week of August 12 through August 16, 2019, and weakly tried to justify his previous denial of her leave request, despite her doctor's order.

30.     Given her impending return to the RHC and Mr. Spencer's discriminatory and harassing behaviors, Plaintiff Acosta's period of leave (first administrative, then annual, and finally FMLA), was consumed by her continuing extreme adverse stress and anxiety (with attendant medical repercussions). Despite knowing Plaintiff Acosta was on medical leave, Mr. Spencer, driven by spite and revenge, intentionally harassed her and degraded her recovery, from, of all things, stress-related illnesses, by contacting her via email, certified mail, and overnight priority mail almost as soon she started her leave.

31.     For example, Mr. Spencer emailed her, advising that upon her return to work, she had to start at 8:15 a.m. Mr. Spencer was hoping to set up Plaintiff Acosta to fail, as he knew that the RHC did not open until 8:30 a.m., and that this would create childcare problems for Plaintiff Acosta, negatively impact her granddaughter's health and Plaintiff Acosta's finances, and, therefore, make it very difficult for her to comply with his command. Mr. Spencer ordered her schedule change, because, among other reasons, Plaintiff Acosta had previously filed a complaint against him for changing her work schedule to 8:15 a.m. The District Government had previously allowed Plaintiff Acosta to start at 9:30 a.m., so that she could care for her granddaughter in the

morning, whose doctor had recommended she receive special care in the morning to help alleviate her behavior and other medical problems.

32.     Mr. Spencer's newly imposed tour of duty once again interfered with Plaintiff Acosta's caregiver responsibilities.

33.     As a result of prior discussions, Mr. Spencer had gone so far as to call and email Plaintiff Acosta's granddaughter's day care several times without Plaintiff Acosta's permission. Mr. Spencer also snooped on Plaintiff Acosta by googling her home address and her granddaughter's daycare center. Later, without permission, Mr. Spencer emailed DHCD officials, a Union representative, and an EEO officer wrongly disclosing Plaintiff Acosta's confidential, personal information about her granddaughter's daycare and her daycare finances.

34.     Plaintiff Acosta returned to the RHC on September 30, 2019, and Mr. Spencer immediately targeted her for termination. As Plaintiff Acosta's September 30, 2019, return loomed, Mr. Spencer took action to remove her from the Union and the employment protections afforded by the collective bargaining agreement. Mr. Spencer allowed RHC staff members, Clerk of the Court LaTonya Miles and attorney D. Grier (who conducts confidential mediations), to remain in the Union, targeting Plaintiff Acosta as the only RHC support staff member to be denied Union representation. As justification (pretext) for depriving Plaintiff Acosta of Union representation, Mr. Spencer falsely claimed that she would have access to confidential and sensitive employee data and information relating to his consideration of employee and labor-management issues (tasks for which Plaintiff Acosta, a Staff Assistant, was not trained to perform). Of course, Mr. Spencer never actually assigned Plaintiff Acosta any work involving confidential and sensitive employee data.

35.     When Mr. Spencer removed Plaintiff Acosta from the Union, he reduced her pay potential and, significantly, simultaneously transferred her from a Career Appointment (Permanent) position to the Legal Service. Mr. Spencer justified removing Plaintiff Acosta from a Career Appointment (Permanent) position, by ordering her to help draft RHC decisions, work that was inappropriate for a non-lawyer without specialized legal training. By changing her from unionized to non-union and from Career Appointment (Permanent) to the Legal Service, Mr. Spencer drastically weakened Plaintiff Acosta's job protections, making it easier for him to harass and fire her.

36.     On October 7, 2019, after Plaintiff Acosta had only been back at the RHC for approximately five workdays, Mr. Spencer issued her a counseling letter. Mr. Spencer's letter was a pretextual resumption of his harassment of Plaintiff Acosta. Mr. Spencer's obsessive drive to exact revenge for Plaintiff Acosta's earlier complaints against him, included an absurd objection that Plaintiff Acosta was in the restroom too long on October 3, 2019 (a visit related to her disability). Mr. Spencer obsession was so perverse that he required Plaintiff Acosta and RHC attorney D. Grier to write detailed "statements" about Plaintiff Acosta's bathroom usage. Mr. Spencer also objected to the fact Plaintiff Acosta turned off the RHC lobby lights when she left work on October 3, 2019, something the RHC Clerk of Court told her to do every day.

37.     On or about October 4, 2019, Plaintiff Acosta provided testimony in D.C. Superior Court about her treatment at the hands of Mr. Spencer. Plaintiff Acosta's statements were truthful; she honestly told the Judge what happened to her and how she felt about Mr. Spencer's harassing and demeaning conduct.

38.     On November 15, 2019, Mr. Spencer, citing unsubstantiated "cause," suspended Plaintiff Acosta for twenty days without pay. Mr. Spencer's suspension letter was lengthy and confusing with hundreds of pages of disorganized "supporting documentation." Due to circumstances outside

of her control, Plaintiff Acosta made a reasonable request for additional time to respond to the proposed suspension, but Mr. Spencer maliciously denied her request.

39.     On November 23, 2019, while Plaintiff Acosta was serving her twenty (20) day, unpaid suspension, Mr. Spencer sent her an email conveying yet another counseling memorandum, specifically reprimanding her for making "a false statement about my character during a hearing at D.C. Superior Court on October 4, 2019." Mr. Spencer complained that Plaintiff's Acosta's testimony included references to and "linked my name and my character to Bill Cosby, Harvey Weinstein and R. Kelly." Mr. Spencer complained that "it appears that you are suggesting that I am a perpetrator such as a rapist or person who is violent."

40.     The November 23, 2019, email had four attachments, the first being an October 22, 2020, counseling memorandum. And, for unjustifiable, prurient reasons, Mr. Spencer included footnotes on the first page which contained graphic descriptions of rape and sexual assault.

41.     Mr. Spencer continued his blatant campaign of harassment and intimidation of Plaintiff Acosta (keeping in mind that she was on unpaid leave foisted on her by Mr. Spencer) by attaching approximately seventeen (17) pages discussing Bill Cosby, approximately forty-seven (47) pages about Harvey Weinstein, and, finally, another approximately seventeen (17) pages concerning R. Kelly. These attachments contain multiple references to and descriptions of violent sexual behavior, child rape and pornography, and sex trafficking. With this sexualized, bizarre, and inappropriate email (which Mr. Spencer had the audacity to describe as a "Counseling Letter"), Mr. Spencer unabashedly established his retaliatory motive was grounded in her testimony in the D.C. Superior Court proceeding (and associated discrimination complaints).

42.     Mr. Spencer was so intent on establishing his dominance over her that he told Plaintiff Acosta to talk to "the District government's Employee Assistance Program and/or your healthcare

provider about why you think it is appropriate to compare me to [these men]." Finally, Mr. Spencer's "Counseling Letter" repeatedly threatened to take future disciplinary action against Plaintiff Acosta if she testified similarly in the future.

43.   On December 12, 2019, Plaintiff Acosta filed an appeal with the District of Columbia Office of Employee Appeals ("OEA") challenging the RHC's decision to suspend her for twenty (20) days. *Acosta v. D.C. Department of Rental Housing*, OEA Matter No.1601-0020-20, Initial Decision, page 3 (OEA, February 25, 2021). The OEA Administrative Judge reversed Mr. Spencer's decision to suspend Plaintiff Acosta for twenty (20) days and ordered that she be reimbursed for lost wages.

44.   Unfinished, on December 30, 2019, Mr. Spencer placed Plaintiff Acosta on yet another PIP (PIP 2). This PIP was a pretext for his retaliation, as seen by, among other things, the fact it is essentially identical to PIP 1, which he used against her in March 2018. Mr. Spencer repeatedly made indirect, but unavoidable, references to his Counseling Letter objecting to her protected October 2019, in-court statements.

45.   On a retaliatory role, on January 22, 2020, Mr. Spencer ordered Plaintiff Acosta to submit to medical and psychiatric fitness for duty examinations. Among other pretextual reasons, Mr. Spencer specifically noted the content of Plaintiff Acosta's testimony as being a basis for his fitness for duty referral. Mr. Spencer told Plaintiff Acosta that she was not allowed to drive to the January 29th medical appointment. Under the constant threat of retaliatory discipline, Plaintiff Acosta worked until after noon that day and paid $40 out of her own pocket for cabs to and from the appointment. Mr. Spencer had also informed her in an email that she was not entitled to take a lunch break on the day of the psychiatric appointment.

46.     In the notification regarding the psychiatric fitness for duty examination, Plaintiff Acosta was told that she had to provide her attending psychiatrist's mental health records to the psychiatrist selected by Spencer (David J. Fischer, M.D.). There was no promise of confidentiality. In other words, neither Mr. Spencer nor Dr. Fischer assured Plaintiff Acosta that Dr. Fischer would hold her private psychiatrist's records confidentially. In fact, in his termination letters (the notice of proposed termination and final decision), Mr. Spencer specifically attributed statements to Dr. Fischer. Wisely, on the advice of her attorney, Plaintiff Acosta declined to sign a release given to her by Dr. Fischer and avoided further breaches of her right to confidentiality. Despite the fact that she did not sign a release, the Dr. Fischer completed a Psychiatric Fitness for Duty Evaluation and sent the confidential medical evaluation to Mr. Spencer, who, later distributed the confidential medical report to RHC attorney Daniel Mayer and to Hearing Officer Kamilah Oliphant (who also forwarded it to another third person) – actions that were clear violations of federal and local privacy laws.

47.     On February 21, 2020, Mr. Spencer issued Plaintiff Acosta an Advance Notice of Proposed Termination. Mr. Spencer designated himself as both the Proposing Official and the Deciding Official. Mr. Spencer selected Attorney Kamilah Oliphant, an Assistant General Counsel at the Department of Behavioral Health (where he himself had worked), as the Hearing Officer (see reference above). Plaintiff Acosta, through counsel, emailed Ms. Oliphant asking her to disclose the extent of her relationship with Mr. Spencer, and, potentially, recuse herself from Plaintiff Acosta's proposed removal. Ms. Oliphant declined to disclose the extent of her relationship with Mr. Spencer and did not recuse herself from hearing this matter.

48.     Mr. Spencer specifically grounded his efforts to fire Plaintiff Acosta in, among other pretexts, her testimony about him during the October 4, 2019, hearing at D.C. Superior Court.

49.     Unsurprisingly, on May 1, 2020, Ms. Oliphant issued an Administrative Review of Adverse Personnel Action supporting the removal of Plaintiff Acosta. Among the purported charges and findings were that Plaintiff Acosta: 1) made inconsistent statements in support of a worker's compensation claim; 2) made unprofessional statements to a colleague, including stating "Thank you Alim.   It's nice to work as a team"; 3) falsely accused Mr. Spencer of sexual harassment; and 4) failed to sign medical releases for Mr. Spencer's hand-chosen medical providers, when she submitted to fitness for duty medical and psychiatric examinations.

50.     On Saturday, May 2, 2020 (one day after the Hearing Officer had issued her Administrative Review), Mr. Spencer emailed a Final Agency Decision to Plaintiff Acosta. Mr. Spencer advised Plaintiff Acosta that she was being fired, after eighteen (18) plus years of employment with the District of Columbia Government, effective May 7, 2020. Among the purported reasons justifying her termination, Mr. Spencer specifically grounded his decision to fire Plaintiff Acosta for, among the other pretexts, her "false statement about my character during a hearing at D.C. Superior court on October 4, 2019..."

## COUNT I
### Violation of the First Amendment Right to Free Association
### 42 U.S.C. § 1983
### (Unlawful Retaliation)

51.     Plaintiff Acosta adopts and incorporates by reference the allegations of the preceding paragraphs as if set forth fully herein.

52.     "[P]ublic employees do not renounce their citizenship when they accept employment, and this Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights... [T]estimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth. The mere fact that a citizen's speech

concerns information acquired by virtue of his public employment does not transform that speech into employee — rather than citizen — speech... The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 238-240 (2014); *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 864 (3rd Cir. 2019).

53.     Further, "[i]n order to prevail on a First Amendment retaliation claim, a government employee must demonstrate that his or her protected activity was a substantial or motivating factor in prompting the retaliatory act." *Ramey v. U.S. Marshals Serv.*, 755 F. Supp. 2d 88, 94 (D.D.C. 2010) (citing *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007)).

54.     Plaintiff Acosta was engaged in protected activity under the First Amendment when, as a District Government employee, she provided testimony in D.C. Superior Court on October 4, 2019.

55.     Once Mr. Spencer learned of Plaintiff Acosta's in-court statements, he used pretextual bases to take disciplinary action against her, but repeatedly referencing her testimony as a basis for his adverse personnel actions.

56.     Defendant District of Columbia has a custom or policy that allowed for retaliation against her unfavorable testimony to permeate decisions made about Plaintiff Acosta.

57.     As a result of Defendant's actions under color of the law of the District Columbia and the District of Columbia's custom and practices, Plaintiff Acosta has suffered and will continue to suffer damages.

## COUNT II
### Violation of the District of Columbia Human Rights Act
### D.C. Code § 2-1401, *et seq.*
### (Retaliation)

60.     Plaintiff Acosta adopts and incorporates by reference the allegations of the preceding paragraphs as if set forth fully herein.

61.     At all pertinent times, Defendant was an employer under the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq.*

62.     At all pertinent times, Plaintiff is an employee entitled to protection under the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq.*

63.     The D.C. Human Rights Act prohibits an employer from taking action against an employee because the employee engages in protected activity and reports acts of discrimination.

64.     Defendant, in violation of the D.C. Human Rights Act, knowingly and intentionally engaged in unlawful retaliation against Plaintiff for reporting discrimination and providing testimony. Specifically, Mr. Spencer methodically built a false history of trumped-up adverse personnel actions against Plaintiff Acosta that follow on and make explicit reference to her discrimination complaints (internally and in Court) and her in-court testimony. Among other things, Mr. Spencer: 1) changed Plaintiff's work schedule to require that she start work at 8:15 a.m., knowingly creating financial and personal hardship for Plaintiff Acosta; 2) removed Plaintiff from a unionized position in a Career Appointment (Permanent) job to a unprotected, non-union position; 3) issued her a counseling letter in November 2018 for use of the restroom one time and turning off lights at the end of the day; 4) counseled her for her testimony in her discrimination case then before the D.C. Superior Court; 5) suspended her for twenty (20) days in November 2019; 6) issued her another counseling letter in November 2019 (while she was on forced, unpaid leave) attempting to intimidate and frighten Plaintiff with graphic descriptions of child sexual abuse, rape, and sexual assault; 7) placed her on a Performance Improvement Plan in December 2019; 8) required her to submit to medical and psychiatric fitness for duty examinations in January

2020; 9) issued a notice proposing her removal in February 2020 and appointed an attorney at his former place of employment (Department of Behavioral Health) as a Hearing Officer; and 10) issued a Final Agency Decision on May 2, 2020, firing Plaintiff after over eighteen (18) years of employment with the District of Columbia Government.

65.    Defendant had no legitimate business reason for any such acts. Mr. Spencer's actions were known to and endorsed by senior management. Mr. Spencer's deranged obsession with Plaintiff Acosta led him to create a series of pretexts to support firing Plaintiff Acosta in the hopes of avoiding responsibility and accountability.

66.    Plaintiff is informed and believes, and based thereon, alleges that, in addition to the practices enumerated above, Defendant has engaged in other discriminatory practices that are not yet fully known.

67.    As a direct and proximate result of Defendant's actions, Plaintiff Acosta suffered and continues to suffer, among other things, severe emotional distress requiring placement in an intensive mental health counseling program, humiliation, emotional pain, suffering, depression, embarrassment, anxiety, weight loss, headaches, vomiting, high blood pressure, and sleeping issues.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Shari Acosta respectfully requests that she be awarded the following relief from Defendant:

A.    Equitable relief requiring the Defendant to reinstate Plaintiff Acosta to her former position in a Career Appointment (Permanent) position outside of Spencer's control and supervision;

B. Economic damages for lost compensation (including for retaliatory, unpaid suspensions), benefits, and damages to Plaintiff Acosta's career;

C. Compensatory damages, in an amount to be determined at trial but no less than five million dollars ($5,000,000) for, but not limited to pain and suffering, emotional distress and reputational damage;

D. Reasonable costs and experts' and attorneys' fees;

E. Pre and post judgment interest as provided by law;

F. A Court Order declaring Defendant's actions to be a violation of the First Amendment Right to Free Association, 42 U.S.C. § 1983, and the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq.*; and

G. A Court Order requiring Defendant to remove all references to disciplinary action taken against Plaintiff Acosta from her personnel record; and

Date: April 2, 2021                              Respectfully submitted,


_____*/s/ David A. Branch*_____
David A. Branch, D.C. Bar No.: 438764
Law Offices of David A. Branch &
Associates, PLLC
1828 L Street, N.W., Suite 820
Washington, D.C. 20036
(202) 785-2805 phone
(202) 785-0289 fax
davidbranch@dbranchlaw.com

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all claims against Defendant.

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April 2021, a copy of the foregoing was served electronically via the Court's CM/ECF e-filing system on counsel for Defendant listed below.

Matthew R. Blecher
Office of the Attorney General for the District of Columbia
441 Fourth Street, NW
Suite 600 South
Washington, D.C. 20001
Phone: (202) 442-9774
Fax: (202) 730-0586
Email: matthew.blecher@dc.gov

Andrew Boddie
Office of the Attorney General for the District of Columbia
400 6th Street, N.W.
Washington, D.C. 22033
Phone: (202) 805-7493
Email: andrew.boddie@dc.gov

*Counsel for Defendant*
*District of Columbia*

                              */s/ David A. Branch*
                              David A. Branch